1

**LATHAM & WATKINS LLP**

2

Mark S. Mester *(pro hac vice)*
mark.mester@lw.com

3

Kathleen Lally *(pro hac vice)*
kathleen.lally@lw.com

4

330 North Wabash Avenue, Suite 2800
Chicago, IL 60611

5

Telephone: (312) 876-7700
Facsimile: (312) 993-9767

6

Matthew Rawlinson (SBN 231890)
matt.rawlinson@lw.com

7

Reuben J. Stob (SBN 281303)
reuben.stob@lw.com

8

140 Scott Drive
Menlo Park, CA 94025

9

Telephone: (650) 328-4600
Facsimile: (650) 463-2600

10

Michael H. Rubin (SBN 214636)

11

michael.rubin@lw.com
505 Montgomery Street, Suite 2000

12

San Francisco, CA 94111
Telephone: (415) 391-0600

13

Facsimile: (415) 395-8095

14

*Attorneys for Defendant Apple Inc.*

15

16

**UNITED STATES DISTRICT COURT**

17

**NORTHERN DISTRICT OF CALIFORNIA**

18

**SAN JOSE DIVISION**

19

| | |
|---|---|
| IN RE APPLE PROCESSOR LITIGATION | Master Docket No. 5:18-CV-00147-EJD |
| | **NOTICE OF MOTION OF DEFENDANT APPLE INC. AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date:  December 13, 2018 Time:  9:00 a.m. Place:  Courtroom 4, 5th Floor Judge:  Hon. Edward J. Davila |

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO THIS HONORABLE COURT, THE PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT on December 13, 2018 at 9:00 a.m. in Courtroom 4 of the United States District Court for the Northern District of California, San Jose Division, located at 280 S. 1st Street, San Jose, California, Defendant Apple Inc. ("Apple") will and hereby does move to dismiss all claims of Plaintiffs Jennifer Abrams, Anthony Bartling, Robert Giraldi, and Jacqueline N. Olson ("Plaintiffs") for relief with prejudice. This motion is supported by the attached Memorandum of Points and Authorities and by the Declaration of Reuben J. Stob and the Request for Judicial Notice and Incorporation by Reference filed herewith.

Apple respectfully submits this motion under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 8(a), and 9(b) on the grounds that the Complaint fails to allege sufficient facts to establish standing or state a claim for any cause of action, and should therefore be dismissed with prejudice.

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.    ISSUES TO BE DECIDED ................................................................................................ 1

II.   INTRODUCTION ............................................................................................................. 1

III.  FACTUAL BACKGROUND ............................................................................................ 3

    A.    The Recently-Discovered Spectre And Meltdown Vulnerabilities ....................... 3

    B.    Project Zero's Discovery Of Spectre And Meltdown .......................................... 4

    C.    Apple's Products ................................................................................................. 5

        1.    The Hardware Component Of Apple Devices .......................................... 5

        2.    The Software Component Of Apple Devices ........................................... 6

        3.    Apple Devices And Security Vulnerabilities ........................................... 6

    D.    Plaintiffs' Lawsuits ............................................................................................ 7

IV.  THE NAMED PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS ........ 7

V.   APPLICABLE PLEADING STANDARDS UNDER RULES 12(B)(6) AND 9(B)........ 9

VI.  PLAINTIFFS CANNOT STATE A BREACH OF WARRANTY CLAIM .................. 10

    A.    Plaintiffs Cannot State An Express Warranty Claim .......................................... 10

    B.    Plaintiffs Cannot State An Implied Warranty Claim Either ............................... 13

VII. PLAINTIFFS CANNOT STATE A CONSUMER FRAUD CLAIM ........................... 14

    A.    Plaintiffs Cannot Allege An Affirmative Misrepresentation .............................. 14

    B.    Plaintiffs Cannot Allege An Actionable Omission ............................................ 15

        1.    For The Period Prior To June 2017, Plaintiffs Do Not Properly
            Allege Any Fact That Apple Knew And Failed To Disclose ................. 15

        2.    For The Entire Class Period, Plaintiffs Can Allege No
            Actionable Omission ............................................................................ 17

            (a)    Apple Had No Duty To Disclose Because Spectre And
                  Meltdown Are Not Safety Hazards ........................................... 17

            (b)    Apple Had No Duty To Disclose Because Disclosure
                  Would Have Violated Government-Endorsed
                  Guidelines for the Protection of Consumers ............................... 18

            (c)    Apple Was Under No Duty To Disclose In Light Of Its
                  Publicly Stated Policy ............................................................... 19

1        C.     Plaintiffs Cannot Allege Reliance .......................................................... 19

2        D.     Plaintiffs Cannot Allege Damages ......................................................... 22

3    VIII.   PLAINTIFFS CANNOT STATE AN UNFAIR COMPETITION CLAIM ................... 23

4    IX.    PLAINTIFFS' TACK-ON CLAIMS ALSO FAIL ........................................ 24

5        A.     Plaintiffs Cannot State An Unjust Enrichment Claim ......................... 24

6        B.     Plaintiffs Cannot State A Products Liability Claim ............................ 25

7    X.     CONCLUSION .................................................................................... 25

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Anderson v. Hyundai,*
   2014 WL 12579305 (C.D. Cal. 2014)..................................................................................9, 23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..........................................................................................................9, 10

*Augustine v. FIA Card Servs.,*
   485 F. Supp. 2d 1172 (E.D. Cal. 2007)..................................................................................19

*Baltazar v. Apple,*
   2011 WL 3795013 (N.D. Cal. 2011) ......................................................................................24

*Baltazar v. Apple,*
   2011 WL 588209 (N.D. Cal. 2011) ........................................................................................15

*Bell Atl. v. Twombly,*
   550 U.S. 544 (2007)................................................................................................................10

*Berenblat v. Apple,*
   2009 WL 2591366 (N.D. Cal. 2009) ......................................................................................25

*Bildstein v. MasterCard,*
   329 F.Supp.2d 410 (S.D.N.Y. 2004)......................................................................................19

*Brace v. Rite Aid,*
   2011 WL 635299 (D.N.H. 2011) ............................................................................................19

*Cahen v. Toyota,*
   147 F.Supp.3d 955 (N.D. Cal. 2015) ...........................................................................8, 9, 23

*Cahen v. Toyota,*
   717 F. App'x 720 (9th Cir. 2017) ....................................................................................8, 23

*In re Chrysler-Dodge-Jeep Ecodiesel,*
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ...................................................................................20

*Clark v. LG Elecs.,*
   2013 WL 5816410 (S.D. Cal. 2013) .......................................................................................11

*Cohen v. Nassau Educators Fed. Credit Union,*
   819 N.Y.S.2d 209 (Sup. Ct. 2006), *aff'd,* 832 N.Y.S.2d 50 (2007)......................................19

*Colman v. Theranos,*
   2018 WL 2463097 (N.D. Cal. 2018) .................................................................................20, 21

*Davidson v. Apple,*
    2017 WL 976048 (N.D. Cal. 2017) ...............................................................11, 14

*Denny v. Ford,*
    87 N.Y.2d 248 (1995) .................................................................................13

*Ferranti v. Hewlett-Packard,*
    2015 WL 5302674 (N.D. Cal. 2015) .............................................................17, 18

*Gautschi v. Auto Body Disc. Ctr.,*
    660 A.2d 1076  (1995) ...............................................................................20

*Glenn v. Hyundai,*
    2016 WL 3621280 (C.D. Cal. 2016)..............................................................24

*Gold v. Lumber Liquidators,*
    2015 WL 7888906 (N.D. Cal. 2015) .....................................................10, 14, 17

*Gratz v. Bollinger,*
    539 U.S. 244 (2003).................................................................................7, 9

*Hall v. Sea World,*
    2015 WL 9659911 (S.D. Cal. 2015) ...............................................19, 20, 21, 24

*Haskins v. Symantec,*
    2014 WL 2450996 (N.D. Cal. 2014), *aff'd,* 654 F. App'x 338 (9th Cir. 2016) ....................21

*Herne v. Cooper Indus.,*
    2005 WL 2671540 (D.N.H. 2005) ................................................................14

*Herremans v. BMW,*
    2014 WL 5017843 (C.D. Cal. 2014)..............................................................18

*Hodges v. Apple,*
    2013 WL 6698762 (N.D. Cal. 2013) ..............................................................18

*In re iPhone 4S Consumer Litig.,*
    2014 U.S. Dist. LEXIS 19363 (N.D. Cal. 2014) ...............................................15

*Kearns v. Ford,*
    567 F.3d 1120 (9th Cir. 2009) ....................................................................10

*Kent v. Hewlett-Packard,*
    2010 WL 2681767 (N.D. Cal. 2010) ......................................................11, 13, 14

*Kraft v. Staten Island Boat Sales,*
    715 F.Supp.2d 464 (S.D.N.Y 2010)...............................................................14

*Kwikset. v. Superior Court,*
    51 Cal.4th 310 (2011) ...............................................................................24

DEF. MOTION TO DISMISS & MEM. ISO THEREOF
Master Docket No. 5:18-CV-00147-EJD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Larin v. Bank of Am.,*
    617 F. App'x 651 (9th Cir. 2015) ........................................................................19

*Leonard v. Abbott Labs.,*
    2012 WL 764199 (E.D.N.Y. 2012)..................................................................15, 17

*Lewis v. Hertz,*
    581 N.Y.S.2d 305 (1992)...................................................................................19

*Lockheed Martin v. RFI Supply,*
    440 F.3d 549 (1st Cir. 2006)..............................................................................25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................................8, 9

*Marcus v. Apple,*
    2015 WL 151489 (N.D. Cal. 2015) ................................................................13, 25

*Marolda v. Symantec,*
    672 F.Supp.2d 992 (N.D. Cal. 2009) ...................................................................20

*McKinney v. Google,*
    2011 WL 3862120 (N.D. Cal. 2011) ..........................................................3, 24, 25

*Minkler v. Apple,*
    65 F.Supp.3d 810 (N.D. Cal. 2014) ..............................................11, 12, 13, 14

*Missaghi v. Apple,*
    2013 WL 12203021 (C.D. Cal. 2013)...................................................................25

*Moore v. Apple,*
    73 F.Supp.3d 1191 (N.D. Cal. 2014) ...................................................................24

*Mount v. PulsePoint,*
    2016 WL 5080131 (S.D.N.Y. 2016), *aff'd*, 684 F. App'x 32 (2d Cir. 2017), *as
    amended* (May 3, 2017) ..................................................................................8, 9

*In re Myford Touch.,*
    2016 WL 6873453 (N.D. Cal. 2016) ...................................................................20

*Nelson v. MillerCoors,*
    246 F.Supp.3d 666 (E.D.N.Y. 2017) ...................................................................10

*Nguyen v. Medora Holdings,*
    2015 WL 4932836 (N.D. Cal. 2015) ...................................................................14

*Oestreicher v. Alienware,*
    544 F.Supp.2d 964 (N.D. Cal. 2008) ...................................................................13

*Ono v. Head Racquet Sports*,
　2016 WL 6647949 (C.D. Cal. 2016)...................................................................21

*Optical Alignment Sys. v. Alignment Servs.*,
　909 F.Supp. 58 (D.N.H. 1995)........................................................................14

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
　85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)...............................20

*Peerless Wall & Window Coverings v. Synchronics*,
　85 F.Supp.2d 519 (W.D. Pa.), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) .................22

*Philips v. Ford*,
　2016 WL 7428810 (N.D. Cal. 2016), *aff'd*, 726 F. App'x 608 (9th Cir. 2018) .................20

*Rasmussen v. Apple*,
　27 F.Supp.3d 1027 (N.D. Cal. 2014) ..........................................................13, 14

*Reddy v. Litton Indus., Inc.*,
　912 F.2d 291 (9th Cir. 1990) .......................................................................16

*In re Sling Media Slingbox Advert. Litig.*,
　202 F. Supp. 3d 352 (S.D.N.Y. 2016).........................................................15, 17

*Slocum v. Alexander Schleicher*,
　2012 WL 893420 (D.N.H. 2012) ................................................................13

*In re Sony PS3 Other OS Litig.*,
　551 F. App'x 916 (9th Cir. 2014) .............................................................10

*Spokeo. v. Robins*,
　136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016), *as revised* (May 2016).........................9

*Sprewell v. Golden State Warriors*,
　266 F.3d 979 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187
　(9th Cir. 2001)............................................................................................17

*Steckman v. Hart Brewing*,
　143 F.3d 1293 (9th Cir. 1998) ..................................................................17

*Suffolk Laundry Servs. v. Redux*,
　238 A.D.2d 577 (1997) ...............................................................................25

*Tae Hee Lee v. Toyota Motor Sales*,
　992 F. Supp. 2d 962 (C.D. Cal. 2014) ......................................................23

*In re Tobacco II Cases*,
　46 Cal.4th 298 (2009) ...........................................................................20, 24

*Vess v. Ciba-Geigy,*
   317 F.3d 1097 (9th Cir. 2003) ...................................................................................10

*VIZIO, Inc. v. Gemtek Tech.,*
   2014 WL 12691575 (C.D. Cal. 2014)........................................................................16

*Wal-Mart v. Dukes,*
   564 U.S. 338 (2011)......................................................................................................9

*Williams v. Yamaha Motor,*
   851 F.3d 1015 (9th Cir. 2017) ............................................................................17, 18

*Williamson v. Apple,*
   2012 WL 3835104 (N.D. Cal. 2012) ......................................... 13, 15, 16-17, 24

*Wilson v. Hewlett-Packard,*
   668 F.3d 1136 (9th Cir. 2012) ..................................................................................17

*Wofford v. Apple,*
   2011 WL 5445054 (S.D. Cal. 2011) ........................................................................24

*Xerox v. Hawkes,*
   124 N.H. 610, 475 A.2d 7 (1984) ............................................................................14

*Yastrab v. Apple,*
   173 F.Supp.3d 972 (N.D. Cal. 2016) .............................................................. *passim*

*Yunker v. Pandora Media,*
   2013 WL 1282980 (N.D. Cal. 2013) ....................................................................8, 23

**STATUTES**

Cal. Bus. & Prof Code § 17200 ......................................................................................23

Cal. Civ. Code § 1760....................................................................................................19

**RULES**

Fed. R. Civ. P. 8(a) .........................................................................................................16

Fed. R. Civ. P. 9(b) .....................................................................................10, 16, 17, 20

Fed. R. Civ. P. 23(a)(2)....................................................................................................9

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution Article III..............................................................................1, 7, 8, 9

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.      ISSUES TO BE DECIDED**

3          The issues to be decided are whether Plaintiffs have alleged facts sufficient to (1) satisfy

4  the injury-in-fact requirement for standing under Article III of the U.S. Constitution, and (2) state

5  a claim upon which relief may be granted for each claim asserted.

6

**II.     INTRODUCTION**

7          This lawsuit arises out of the discovery and mitigation of two computer security

8  vulnerabilities called Spectre and Meltdown. These are just two of many vulnerabilities the

9  industry identifies and issues software updates to patch each year. Spectre and Meltdown were

10  discovered by the "Project Zero" team at Google LLC ("Google"), which worked with the

11  industry to protect users against them. Pursuant to those efforts, mitigations were developed and

12  released on an industry-wide basis *before* bad actors learned of the vulnerabilities. To Apple's

13  knowledge -- as well as the extent of Plaintiffs' allegations -- no consumer device has ever

14  suffered an attack based on Spectre or Meltdown.

15          Nonetheless, plaintiffs have initiated lawsuits against virtually every major developer of

16  modern computer processors, asserting assorted claims. In this case, Plaintiffs assert claims on

17  behalf of a proposed class of all purchasers of certain Apple devices from January 1, 2010 to the

18  present, for breach of express and implied warranty and violations the Consumer Legal

19  Remedies Act (and analogous consumer fraud statutes in New Hampshire and New York), as

20  well as for unjust enrichment and products liability.[1] Because the named Plaintiffs fail to allege

21  that they themselves have suffered any injury as a result of Spectre or Meltdown, they lack

22  standing to assert any of their claims. And in any event, for the reasons set forth below, they

23  have not properly alleged any facts that (even if true) would constitute an actionable claim.

24          Plaintiffs' warranty claims should be dismissed because security vulnerabilities like

25  Spectre and Meltdown are beyond the scope of their coverages. Apple's warranty language has

26  been examined and construed by this Court (and by other courts in this district) repeatedly. This

27

---

28

[1] The proposed class in this matter is limited to purchasers of devices -- such as the iPhone, iPad, iPod Touche, and Apple TV -- that include central processors designed by Apple. It does *not* include purchasers of devices that include Intel processors.

1    Court's conclusions regarding these warranties, consistent with the plain language of the

2    warranties themselves, are fatal to Plaintiffs' claims. Apple's hardware warranty, which applies

3    to the physical components of Apple devices, covers defects in materials and workmanship that

4    occur within one year of purchase. And Apple's software license, which applies to the software

5    components of its devices, is clear that security updates are provided on an "as is" basis—a fact

6    consistent with the inherently ongoing nature of the fight against vulnerabilities.

7          And even putting aside Apple's warranties, Plaintiffs unsurprisingly allege no statement

8    by Apple promising that its devices are immune to newly discovered security vulnerabilities. Nor

9    do they identify any promise by Apple that its devices will meet specific performance metrics,

10   much less one they have allegedly failed to meet here. In short, Plaintiffs have not alleged any

11   facts that could support a claim that Apple has breached any promise it made to them.

12         Plaintiffs' consumer fraud claims should also be dismissed. Because Apple did not

13   breach any promise to Plaintiffs, Plaintiffs' claims (if any) are necessarily limited to a theory that

14   Apple failed to disclose some fact or facts it was under a duty to disclose. Plaintiffs suggest that

15   Apple failed to disclose the existence of Spectre and Meltdown and the potential impact that

16   efforts to mitigate Spectre and Meltdown might have on the performance of the devices. This

17   claim fails, however, for four reasons. *First*, for the period prior to Project Zero's discovery of

18   the vulnerabilities (*i.e.*, 2010-May 2017), Plaintiffs have failed to properly allege the existence of

19   any facts regarding Spectre and Meltdown that Apple failed to disclose, much less specific

20   allegations that would support an inference that Apple was aware of such facts. *Second*, all of

21   Plaintiffs' omission claims fail, because under California law, Apple's duty to disclose is limited

22   to facts inconsistent with a warranty or regarding a "safety issue," and neither of those conditions

23   is met here. *Third*, for the period following Project Zero's discovery of Spectre and Meltdown,

24   there was no duty to disclose because Apple participated in a "coordinated disclosure" process

25   led by Project Zero, endorsed by the Department of Homeland Security, and expressly intended

26   to protect consumers. *Fourth*, Apple expressly tells consumers that, "[f]or [their] protection, [it]

27   doesn't disclose, discuss, or confirm security issues until an investigation has occurred and

28   patches or releases are available." It was not misleading for Apple to follow its stated policy.

1    Reliance and damages are also necessary elements of Plaintiffs' consumer fraud claims.

2    But Plaintiffs fail to allege *any* facts supporting an inference of reliance. Nor, given the industry-

3    wide nature of Spectre and Meltdown, can they allege that they would have purchased an

4    alternative, vulnerability-free device had they been informed of Spectre and Meltdown. And

5    since neither vulnerability has ever been used to compromise an Apple device (or for that matter

6    any consumer's device), they cannot allege that they have been damaged by either of them.

7    Finally, Plaintiffs assert an unfair competition claim and tack-on claims for unjust

8    enrichment and products liability. These claims should also be dismissed. The unfair competition

9    claim fails for lack of reliance and damages, and because there was nothing fraudulent, unlawful,

10   or unfair about Apple's government-endorsed approach to Spectre and Meltdown. The unjust

11   enrichment claim fails because it cannot stand alone and is precluded by Plaintiffs' warranty

12   claims. And the products liability claims fail because Plaintiffs allege no non-economic damages.

13   **III.    FACTUAL BACKGROUND**

14         **A.    The Recently-Discovered Spectre And Meltdown Vulnerabilities**

15   Spectre and Meltdown are recently-discovered security vulnerabilities. They are just two

16   of the scores of vulnerabilities (or more) that industry players identify and patch each year. *See*,

17   *e.g.*, Ex. C at 3-14; Ex. D at 33.[2] And they are rooted in a nearly pervasive feature of modern

18   computer processing called "speculative execution." "[N]early all modern computing systems --

19   including phones, laptops, and cloud services" -- use speculative execution and thus "rely on

20   vulnerable chipsets," Ex. F at 1, including chipsets from Intel Corporation ("Intel"), Advanced

21   Micro Devices, Inc. ("AMD") and ARM Holdings PLC ("ARM"). Ex. H at 1 (noting that

22   "vulnerable speculative execution capabilities are found in . . . billions of devices" worldwide).

23   Speculative execution "improves [computer processing] speed by operating on multiple

24   instructions at once." *See* Ex. C at 1. To increase performance, the processor predicts which code

25   it will be instructed to execute next and prepares output based on its prediction. *See id*. If its

26   _____

[2] All "Ex." references are to the exhibits to the Declaration of Reuben J. Stob filed herewith.

27   Page references refer to the internal page designations in headers of the exhibits. Most of these
materials are from materials incorporated into the Complaint, and are referenced here simply for

28   background. Apple's Motion in no sense depends on these materials, nor does the Court need to
make factual determinations to resolve this Motion, as Plaintiffs' claims fail as a matter of law.

1   prediction turns out to be right, performance is increased because the output is already prepared

2   when the instruction arrives. *See id.* And if its prediction turns out to be wrong, it simply discards

3   the output and proceeds as if it had made no prediction. *See id.* Virtually every modern computer

4   made in the past 10 years, including virtually every mobile, desktop, and laptop computer and

5   webserver, relies on speculative execution to process the vast quantities of data needed to

6   support the internet and most modern computing operations. *See*, *e.g.*, Ex. G at 5, 10; Ex. H at 1.

7       Spectre and Meltdown render computers potentially susceptible to what computer

8   scientists and security researchers call "side-channel" attacks. *See* Compl. ¶ 31. Notably,

9   however, only lab-based proofs for Spectre and Meltdown have ever been devised; no real-world

10  exploit of either is known to exist -- none is alleged in the Complaint, and Apple is not aware of

11  either having ever been used to illicitly gather information from an actual user's device. *See*, *e.g.*,

12  Ex. C at 1; Ex. F at 5; Ex. G at 6. In other words, to Apple's knowledge there has never been any

13  known use of these types of attacks -- and Plaintiffs allege none -- against any consumer product.

14      **B.    Project Zero's Discovery Of Spectre And Meltdown**

15      Spectre and Meltdown were discovered in mid-2017 by Project Zero, a full-time team of

16  Google security researchers dedicated solely to identifying "zero-day" security vulnerabilities

17  (vulnerabilities that are unknown to those who would have an interest in mitigating them) before

18  bad actors do.[3] *See* Ex. F at 1, 6; Ex. G at 7. Vulnerabilities discovered by Project Zero are

19  reported to developers and manufacturers of affected products, who are incentivized to remedy

20  or "patch" them before Project Zero discloses them publicly, which it typically does after 90

21  days (a deadline that can be extended with its agreement). Project Zero first successfully devised

22  proofs of concept for Spectre and Meltdown in May 2017, almost a decade after speculative

23  execution had achieved ubiquity. Immediately upon doing so, Project Zero notified major chip

24  developers Intel, AMD, and ARM. *See* Ex. F at 6, 11. ARM, in turn, notified Apple. *See id.*

25      In accordance with Project Zero's mission and the industry-standard approach to

26  addressing security vulnerabilities, known as "coordinated" (or sometimes "responsible")

27

28  ---
    [3] Plaintiffs allege that Spectre and Meltdown were also separately reported around the same time by teams from Cyberus Technology and the Graz University of Technology. *See* Compl. ¶ 49.

1    disclosure, when Project Zero disclosed Spectre and Meltdown to impacted manufacturers, it did

2    so pursuant to agreements prohibiting them from disclosing the information they received. *See*

3    Ex. F at 6. Compliance with coordinated disclosure principles requires industry participants like

4    Google (including Project Zero), Intel, AMD, ARM, and Apple to protect users from bad actors

5    by keeping security vulnerabilities non-public until patches can be released. The federal

6    government endorses this approach because it best protects consumers. For example, the

7    Computer Emergency Readiness Team Coordination Center ("CERT/CC"), a federally funded

8    research and development center sponsored by the Departments of Defense and Homeland

9    Security, *see* Compl. ¶ 43 – expressly warns that "disclosing [vulnerabilities] without review and

10   mitigation only opens the public up to exploitation." *See* Ex. D at 32; *see also id.* at 7. Upon

11   learning of Spectre and Meltdown, Project Zero initially imposed a late-August 2017 deadline

12   for public disclosure. Recognizing the complexity of Spectre and Meltdown, however, it later

13   decided to extend the deadline to January 9, 2018. *See* Ex. F at 2, 6-8, 11. Apple was thus able to

14   design and release a software patch in December 2017, well ahead of the revised deadline. *See*

15   Compl. ¶ 40; Ex. C at 1, 5-6; Ex. F at 6. As noted above, no real-world exploit of either Spectre

16   or Meltdown is yet known to exist. *See*, *e.g.*, Ex. C at 1; Ex. F at 5, 9; Ex. G at 6.

17          **C.      Apple's Products**

18          Although Spectre and Meltdown potentially impact many different devices from

19   manufacturers around the world, this lawsuit concerns just a subset of devices from a single

20   manufacturer: Apple's mobile and compact computing devices (the "Apple Devices"). *See*

21   Compl. ¶ 1 (listing Apple's iPhone, iPad, iPod, and Apple TV devices). Each Apple Device is

22   comprised of both a hardware and a software component.

23              **1.      The Hardware Component Of Apple Devices**

24          The hardware component of each Apple Device (the "Apple Hardware") comprises all of

25   its physical elements, including its screen, its casing, its memory, and at its heart its central

26   processing unit (or "CPU"). *See* Compl. ¶ 17. Each CPU contains a circuit of enormous

27   complexity, designed to carry out the millions of instructions delivered by the software

28   component of the device. *See id.* Apple has designed its own CPUs for Apple Devices since

2010, based on architectural instruction sets licensed from ARM. *See id.* ¶ 36. Apple Hardware is sold under the terms of a warranty (Apple's "Hardware Warranty") that expressly protects consumers "against defects in materials and workmanship . . . for a period of ONE (1) YEAR from the date of original retail purchase[.]" *See* Ex. A at 1-2.[4] All other warranties (including the implied warranty of merchantability and warranties against hidden or latent "defects") are effectively disclaimed in the Hardware Warranty using standard warranty language. *See id.*

### 2.      The Software Component Of Apple Devices

The software component of each Apple Device (the "Apple Software") comprises the iOS or tvOS operating system and applications on the device (including, for example, Apple's Safari browser and Mail), whether that software is on the device at purchase or subsequently downloaded. *See* Ex. B at 1.[5] Apple Software is licensed to purchasers of Apple Devices under the terms of a Software License (Apple's "Software License"). *See* Ex. B. Given the inherent impracticability of warranting against continually evolving and as yet undiscovered threats, all express and implied warranties (including the implied warranty of merchantability and warranties against hidden or latent "defects") are effectively disclaimed in the Software License using standard warranty language. *See id.* at 6 § 7.3 (explaining that the software is provided on an "'as is' and as 'available'" basis "with all faults and without any warranty"); *id.* at § 7.6 (clarifying that "no oral or written information or advice given by Apple . . . shall create a warranty" of any kind). The Software License also informs consumers that updates and other downloads, "if any, may not . . . include all existing software features." *See id.* at 1 § 1(b).

### 3.      Apple Devices And Security Vulnerabilities

Neither Apple's Hardware Warranty nor its Software License provides that Apple Devices do not contain security vulnerabilities. Nor would it be practical to do so, since as

---

[4] Plaintiffs cite to the versions of the Hardware Warranty available at https://www.apple.com/legal/warranty/products/ios-warranty-document-us.html (*see* Compl. ¶¶ 103 n. 50, 152 n.51, and 176 n. 52) and Exhibit A also includes English-language versions extending to the beginning of the class period. Since no version differs from the others for purposes of this Motion, *see* Ex. A at 1-87, all citations herein are to the "August 26, 2016 – Present" version. *See id.* at 1-5.

[5] Exhibit B includes the English-language versions of the Software License applicable to Apple's tvOS 11, iOS 11, and iOS 11.2 operating systems and related software, which are the versions that contained the Spectre and Meltdown patches referenced in the Complaint, and versions from the beginning of the class period. The relevant language in every version is the same.

CERT/CC has noted, "nearly all software-centric products contain [security] vulnerabilities," and "the potential for [such] vulnerabilities will likely never go away since a previously secure system can become vulnerable when deployed into a new context" or "due to environmental changes or the development of novel attack techniques." Ex. D at 33. Given the ubiquity of newly-discovered vulnerabilities, the industry must continually design and release mitigations.

### D. Plaintiffs' Lawsuits

Following the release of mitigations for Spectre and Meltdown, claimants around the country (and the world) immediately filed lawsuits against almost every major manufacturer of modern computer processors. Here, Plaintiffs seek to represent a class of consumers who purchased Apple Devices between January 1, 2010 and the present, and assert an assortment of claims, including for violations of the California, New York, and New Hampshire consumer fraud statutes (Counts IV-V, IX, and XII-XIII), breach of express and implied warranty under California, New York, and New Hampshire law (Counts I-III, VI-VIII and X-XI), unjust enrichment under no specified law (Count XVI), and products liability in both negligence and strict liability, again under no specified law (Counts XIV and XV). Plaintiffs allege in conclusory fashion that "Apple knew about [Spectre and Meltdown] months (if not years) before the public . . . [and] concealed th[em] . . . without warning unsuspecting consumers," (*see* Compl. ¶ 4) asserting that with "proper tests and security checks," Spectre and Meltdown "would have been evident," apparently to anyone in the industry (*see id*. ¶ 49).

Plaintiffs do not, however, allege any promise by Apple that Apple Devices are immune to security vulnerabilities or will perform to any particular speed benchmarks, or that they personally have experienced any slowdown of their Apple Devices. They also allege no promise by Apple that updates to the Apple Software will not affect the performance of Apple Devices. Nor do they plead any facts that would support a conclusion that anyone had discovered Spectre or Meltdown before mid-2017, much less that Apple was aware of them.

### IV.   THE NAMED PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

Named plaintiffs in putative class actions must show they personally have been injured. *See Gratz v. Bollinger*, 539 U.S. 244, 289 (2003). To establish Article III standing, plaintiffs

must sufficiently allege an injury-in-fact based on "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Plaintiffs allege generally that (i) Spectre and Meltdown "expose[]" Apple Devices "to unauthorized access," and (ii) Apple's "patches" for Spectre and Meltdown "degrade[ the] performance" of Apple Devices, but no named Plaintiff alleges any degradation in the performance of his or her own Apple device. Plaintiffs also allege that, had they known about Spectre and Meltdown, they "would not have purchased [their] Apple Devices" or would have "paid [less]" for them. These allegations are insufficient to establish Article III standing with respect to the named Plaintiffs.

First, no named Plaintiff alleges that his or her Apple Device has been "access[ed]" using Spectre or Meltdown. It is well established that exposure to a potential "future injury caused by insecure software is not an injury" for purposes of Article III. *See, e.g., Cahen v. Toyota*, 147 F. Supp. 3d 955, 969 (N.D. Cal. 2015) (dismissing all claims where plaintiffs alleged that their vehicles "might be hacked at some point in the future"); *Cahen v. Toyota*, 717 F. App'x 720, 723 (9th Cir. 2017) (upholding dismissal where "Plaintiffs d[id] not allege that any of their vehicles ha[d] actually been hacked"); *Yunker v. Pandora Media*, 2013 WL 1282980, at *5 (N.D. Cal. 2013) (holding that "the possibility of future harm is insufficient to establish standing" where "at best [plaintiff] allege[d] facts that show[ed] it might be possible that, in the future, he could be the victim of identity theft"). Plaintiff's "exposure" allegations thus cannot confer standing here.

*Second*, no named Plaintiff alleges any "degrad[ation in the] performance" of his or her Apple Device. Plaintiffs do allege that certain other, unnamed "iPhone users" reportedly found a "decrease in performance" under unspecified conditions (*see* Compl ¶ 42). But they nowhere allege that their own Apple Devices were tested, or even that any of them subjectively noticed any slowdown. Allegations like these are neither "concrete" nor "particularized" for purposes of Article III. *See Yunker*, 2013 WL 1282980, at *4 (rejecting plaintiffs theory of "[d]imunition in the performance of [plaintiffs'] device" where he "d[id] not allege that he noticed any performance problems or that he had problems with his phone"); *Mount v. PulsePoint*, 2016 WL 5080131, at *5 (S.D.N.Y. 2016), *aff'd*, 684 F. App'x 32 (2d Cir. 2017), *as amended* (May 3,

1   2017) (dismissing claims where plaintiffs "nowhere alleged that either [named plaintiff] suffered

2   slower browser performance" and the court thus could not "infer that [they] experienced any

3   appreciable [injury]").[6] Plaintiffs' "performance" allegations thus cannot confer standing either.

4   *Third* and finally, although the named Plaintiffs allege that they "would not have

5   purchased Apple Devices" or would have "paid [less]" had they known of Spectre and

6   Meltdown, without any underlying harm, these allegations lack any basis. Indeed, no named

7   Plaintiff alleges that he or she has used his or her Apple Device less, seen its market value

8   decrease because of Spectre or Meltdown, or switched to another brand that was not vulnerable

9   to Spectre or Meltdown. Allegations like these would be insufficient even if Apple Devices were

10  the only devices subject to Spectre and Meltdown. *See, e.g.*, *Anderson v. Hyundai,* 2014 WL

11  12579305, at *7 (C.D. Cal. 2014) (noting that "[t]o the extent [p]laintiffs contend[ed] that their

12  Tiburons [we]re worth less because [of the defect they alleged], they ha[d] not alleged that they

13  [we]re unwilling to drive their vehicles, that they ha[d] sold or traded their vehicles at a loss, or

14  any other facts [to] plausibly demonstrate that the[ir vehicles] ha[d] diminished in value due to

15  the alleged defect"). But their insufficiency is even clearer given that Spectre and Meltdown

16  affect devices world- and industry-wide. *See infra* § VII.C; *Cahen,* 147 F.Supp.3d at 970 (voicing

17  skepticism that an industry-wide defect "would translate into economic injury" under Article III).

18  In sum, the named Plaintiffs lack Article III standing because their allegations fail to

19  establish that any of them personally has suffered an injury-in-fact. *See Lujan* at 555; *Bollinger*

20  at 289. And for this reason alone, all of their claims should be dismissed.

21  **V.    APPLICABLE PLEADING STANDARDS UNDER RULES 12(B)(6) AND 9(B)**

22  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

23  accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

24  _____

25  [6] Even setting the named Plaintiffs aside, *Spokeo* is implicated to the extent that any substantial portion of the proposed classes also experienced *no* performance impact, and *Dukes* is implicated to the extent *different* members who experienced *any* impacts experienced *different* ones. *See Spokeo v. Robins*, 136 S. Ct. 1540, 1543, 194 L. Ed. 2d 635 (2016), *as revised* (May 2016) (holding that a plaintiff must plead "a *concrete injury* even in the context of a statutory violation") (emphasis added); *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011) (holding that under Rule 23(a)(2), "[plaintiffs'] claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

1   U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). Further,

2   allegations that "sound in fraud" must meet the particularity requirement of Fed. R. Civ. P. 9(b).

3   *Vess v. Ciba-Geigy*, 317 F.3d 1097, 1106 (9th Cir. 2003). To comply with Rule 9(b), a plaintiff

4   must allege "'the who, what, when, where, and how of the misconduct charged,'" including

5   "what is false or misleading about a statement, and why it is false." *Id.* In the Ninth Circuit, the

6   heightened Rule 9(b) standard applies to all consumer fraud claims, regardless of the underlying

7   law. *See*, *e.g.*, *Kearns v. Ford*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Gold v. Lumber Liquidators*,

8   2015 WL 7888906, at *12 (N.D. Cal. 2015) (holding that "federal courts in California are bound

9   to apply . . . Rule 9(b) to . . . consumer protection claims [sounding in fraud]").

10  **VI.     PLAINTIFFS CANNOT STATE A BREACH OF WARRANTY CLAIM**

11          Plaintiffs assert express and implied warranty claims under the California, New

12  Hampshire, and New York commercial codes and an implied warranty claim under California's

13  Song-Beverly Consumer Warranty Act. Because the terms of Apple's warranties -- which this

14  Court has examined and applied in dismissing unfounded claims on numerous prior occasions --

15  plainly exclude the coverages Plaintiffs seek here, their warranty claims should be dismissed.[7]

16          **A.     Plaintiffs Cannot State An Express Warranty Claim**

17          To state an express warranty claim under California (or New York or New Hampshire)

18  law, a plaintiff must allege "a 'specific and unequivocal written statement' constituting an

19  explicit guarantee." *Yastrab v. Apple*, 173 F. Supp. 3d 972, 982 (N.D. Cal. 2016) (Davila. J); *see*

20  *also Nelson v. MillerCoors*, 246 F.Supp.3d 666, 679 n.8 (E.D.N.Y. 2017) (noting that "the

21  provisions [of all three states] are functionally identical"). Not only do Plaintiffs identify no

22  statement promising that Apple Devices will never be susceptible to vulnerabilities "requiring an

23  operating system-level remedial measure that will degrade . . . performance," *see* Compl. ¶ 116,

24  the language of Apple's warranties confirms that such coverage was excluded.

25          Apple's Hardware Warranty protects consumers "against defects in materials and

26  _____

27  [7] Plaintiffs also assert claims under the Magnuson-Moss Warranty Act. *See* Compl. ¶¶ 110-118
    (Count III). But the Magnuson-Moss Warranty Act merely provides a federal cause of action for
    state-law breaches and thus adds nothing to Plaintiffs' Complaint. *See*, *e.g.*, *In re Sony PS3 Other*

28  *OS Litig.*, 551 F. App'x 916, 920 (9th Cir. 2014) (dismissing claims, because the "disposition of
    the state law warranty claims determines the disposition of the Magnuson–Moss Act claims").

1   workmanship" for a period of one year. Ex. A at 1. Unsurprisingly it "does not warrant that . . .

2   operation" of Apple Devices will always "be uninterrupted or error free." And it "does not apply

3   to . . . software," which is governed by the Software License. *Id*. at 1-2. Here, Plaintiffs' express

4   warranty claim is based on an allegation that "Apple processors suffer[] from several *design*

5   *defects* -- collectively called 'Meltdown' and 'Spectre.'" Compl. ¶ 2 (emphasis added); *see also*

6   *id*. ¶¶ 116, 192. But it is well-settled that such "defects" are beyond the scope of  a "warranty

7   covering 'materials and workmanship.'"[8] *See Davidson v. Apple*, 2017 WL 976048, at *11 (N.D.

8   Cal. 2017) (dismissing claim for breach of the Apple Hardware Warranty on the ground that

9   design "defects" are beyond its scope; *see also* Compl. ¶ 2; *Clark v. LG Elecs.*, 2013 WL

10  5816410, at *7 (S.D. Cal. 2013) (holding generally that design "defects" are beyond the scope of

11  "an express warranty covering 'materials and workmanship'"); *Kent v. Hewlett-Packard*, 2010

12  WL 2681767, at *6 (N.D. Cal. 2010) (finding no breach of express warranty where "HP d[id] not

13  warrant that [ ]operation . . . w[ould] be uninterrupted or error-free"). Nor can the Hardware

14  Warranty support a claim based on the performance effects of the Apple Software, including any

15  updates Plaintiffs may have elected to download to patch Spectre or Meltdown. *See, e.g.*,

16  *Minkler v. Apple*, 65 F. Supp. 3d 810, 818 (N.D. Cal. 2014) (dismissing claim for breach of the

17  Hardware Warranty on the ground that it "clearly indicates that it does not apply to software").

18          As its title suggests, Apple's Software License *does* apply to software, including any

19  updates intended to patch security vulnerabilities. But unsurprisingly, given the ongoing nature

20  of the fight against such vulnerabilities, *see supra* Section III.A, Apple does not warrant against

21  the universe of evolving and newly created threats, nor does it guarantee that future versions of

22  its software will always perform at the same speed. In this regard, its Software License explains,

23  among other things, that its security patches and other software updates are provided on an "'as

24  is' and 'as available'" basis. *See* Ex. B at 6 § 7.3; *see also*, *e.g. id.* § 7.2 (clarifying that "use of

25  the . . . software . . . is at [the consumer's] sole risk"); *id.* § 7.6 (clarifying that "should the

26  software . . . prove defective, [the consumer] assumes[s] the entire cost of all necessary

27

28  ─────────────
    [8] Nor is there any properly-pled design defect. Speculative execution, upon which the vast
    majority of modern processors rely to process enormous amounts of data, is not a design defect
    simply because it is susceptible (like all real-world designs) to potential attacks.

1    servicing, repair, or correction"). In other words, neither the Hardware Warranty nor the

2    Software License can support a claim based on Spectre, Meltdown, or other as yet undiscovered

3    security vulnerabilities that arise and Apple consistently works to patch, or based on any

4    performance effects -- whether positive or negative -- that these patches themselves may have.

5    *See, e.g.*, *Minkler*, 65 F. Supp. 3d at 818 (dismissing claim for breach of the Software License

6    because coverage of the sort Plaintiffs seek is simply not provided).

7          In their pleadings, Plaintiffs ignore all of this and instead base their allegations on a series

8    of press releases and YouTube videos. *See* Compl. ¶¶ 54-80. But this ignores that the Software

9    License provides in all capitals that "no oral or written information or advice given by Apple or

10   an Apple authorized representative shall create a warranty." Ex. B at 6 § 7.6; *Minkler*, 65 F.

11   Supp. 3d at 818 (finding no express warranty in statements made by Apple's CEO, since "by

12   agreeing to [the] terms [of the Software License] Plaintiff acknowledged that 'no oral or written

13   information or advice given by Apple or an Apple authorized representative shall create a

14   warranty.'"). And even setting that language aside, none of the press releases or videos Plaintiffs

15   cite include anything resembling "a 'specific and unequivocal written statement' constituting an

16   explicit guarantee." *See Yastrab*, 173 F. Supp. 3d at 982. To the contrary, none does anything

17   more than describe Apple products as possessing desirable, high-level attributes like "remarkable

18   speed and efficiency" and "industry-leading performance." *See* Compl. ¶¶ 54-80.

19         None of the press releases or YouTube videos cited by Plaintiffs says anything at all

20   about security vulnerabilities. None concerns the performance effects of security updates or

21   patches. None gives any specific speed metric (or any other specific performance metric) for any

22   individual Apple Device. And none so much as mentions any iPod or Apple TV device. In short,

23   none comes close to implying, much less "specific[ally,] unequivocal[ly, and] … explicit[ly]

24   guarantee[ing]" that Apple Devices are impervious to vulnerabilities and the performance effects

25   of patches. *See Yastrab*, 173 F. Supp. 3d at 982 (Davila, J.) (dismissing express warranty claim

26   brought under the same Apple warranties at issue here, where no statement identified by

27   plaintiffs constituted "a specific and unequivocal written statement constituting an explicit

28   guarantee that [the] functionality [of their iPhones] would not be affected by future software

1  updates"); *see also*, *e.g.*, *McKinney v. Google*, 2011 WL 3862120, at *4 (N.D. Cal. 2011)

2  (Davila, J.) (dismissing express warranty claim because plaintiffs' "[g]eneral assertions about

3  representations or impressions given by [Google] about [its] phone's 3G capabilities" were "not

4  equivalent to a recitation of the exact terms of the underlying warranty").[9]

5         In sum, Apple has never promised -- because doing so would simply not be practicable --

6  that Apple Devices will forever be free from security vulnerabilities and any performance effects

7  of patches. As a result, Plaintiffs' express warranty claims must be dismissed.

8         **B.    Plaintiffs Cannot State An Implied Warranty Claim Either**

9         To state an implied warranty claim, a plaintiff must allege that a covered product does

10  "not possess even the most basic degree of fitness for ordinary use." *See Marcus v. Apple*, 2015

11  WL 151489, at *9 (N.D. Cal. 2015); *see also Slocum v. Alexander Schleicher*, 2012 WL 893420,

12  at *3 (D.N.H. 2012); *Denny v. Ford*, 87 N.Y. 2d 248, 258 n.4 (1995). Nothing in Plaintiffs'

13  factual allegations, however, supports such a suggestion here. *See Williamson v. Apple*, 2012 WL

14  3835104, at *8 (N.D. Cal. 2012) (Davila, J.) (dismissing implied warranty claim, where

15  plaintiff's allegations "ha[d] nothing to do with the iPhone 4's intended use as a smartphone,

16  which the court safely presume[d] include[d] functions like making and receiving calls, sending

17  and receiving text messages, [and] allowing for the use of mobile applications"); *Minkler*, 65

18  F.Supp.3d at 814 (Davila, J.) (dismissing implied warranty claims, where "[t]he iPhone 5 ha[d] a

19  multitude of uses (including a phone, music player, game console, and web browser), and while

20  [p]laintiff claim[ed] to have used Apple Maps, [she] never allege[d] that she used the iPhone

21  solely for navigation"). To the contrary, Apple Devices continue to be used by hundreds of

22  millions of consumers worldwide. *See*, *e.g.*, Ex. G at 1. Plaintiffs do not even allege that they

23  have stopped using their own Apple Devices or refrained from purchasing new ones. *See Kent*,

24  2010 WL 2681767, at *4 (dismissing implied warranty claim where "Plaintiffs do not allege that

25
─────────────────
26  [9] All of the statements Plaintiffs cite are non-actionable in any event. *See*, *e.g.*, *Oestreicher v. Alienware*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) (holding that statements regarding a product being "faster, more powerful, and more innovative" with "higher performance" are

27  "non-actionable puffery"); *Rasmussen v. Apple*, 27 F. Supp. 3d 1027, 1039 (N.D. Cal. 2014) (holding that "a representation of fact, as opposed to mere puffery, is one which makes a

28  'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact'").

1    they have been forced to abandon the use of their computers completely"). Because Plaintiffs

2    cannot allege facts to support an implied warranty claim, their claims should be dismissed.

3           Moreover, Plaintiffs' implied warranty claims should be dismissed because Apple

4    disclaimed such coverage in language courts have repeatedly found effective. *See Minkler*, 65 F.

5    Supp. 3d at 819 (finding that the Hardware Warranty and Software both exclude "implied

6    warranties"); *Davidson*, 2017 WL 976048, at *15 (holding that the Hardware Warranty

7    "disclaim[s] all implied warranties"); *see also Xerox v. Hawkes*, 124 N.H. 610, 616-17, 475 A.2d

8    7, 10 (1984); *Kraft v. Staten Island Boat Sales*, 715 F. Supp. 2d 464, 473 (S.D.N.Y 2010).

9    **VII.    PLAINTIFFS CANNOT STATE A CONSUMER FRAUD CLAIM**

10          To state a consumer fraud claim, a plaintiff must allege with particularity a

11   "misrepresentation, reliance, and damages." *Yastrab*, 173 F. Supp. 3d at 977 (Davila, J.).

12   Deceptive conduct may take the form of either an affirmative misrepresentation or an actionable

13   omission. *Rasmussen*, 27 F. Supp. 3d at 1032; *Gold*, 2015 WL 7888906, at *11 (applying New

14   York law); *Herne v. Cooper Indus.*, 2005 WL 2671540, at *3 (D.N.H. 2005).[10]

15          **A.      Plaintiffs Cannot Allege An Affirmative Misrepresentation**

16          Plaintiffs cannot allege an affirmative misrepresentation because, as is discussed *supra*

17   Section VI.A, none of the statements Plaintiffs cite does anything more than describe one or

18   more Apple products as possessing desirable, high-level attributes like "remarkable speed and

19   efficiency" and "industry-leading performance." *See* Compl. ¶¶ 54-80. For the same reasons such

20   non-specific statements cannot constitute warranties, they do not qualify as misrepresentations.

21   *See*, *e.g.*, *Yastrab* 173 F. Supp. 3d at 979 (Davila, J.) (dismissing consumer fraud claim based on

22   "general descriptions [of] the iPhone's attributes," because such descriptions could not be

23   construed as "pre-purchase representations made by Apple about the consistency of these

24

---

25   [10] *See also Nguyen v. Medora Holdings*, 2015 WL 4932836, at *2 n. 21 (N.D. Cal. 2015)
     (observing that the consumer protection "statutes in . . . New York . . . are similar to those in
26   California"); *Optical Alignment Sys. v. Alignment Servs.*, 909 F. Supp. 58, 62 (D.N.H. 1995)
     (explaining that the New Hampshire consumer fraud statute "prohibits the use of 'any unfair or
27   deceptive act or practice in the conduct of any trade or commerce'"); *Gold*, 2015 WL 7888906,
     at *12 (holding that "federal courts in California are bound to apply Ninth Circuit precedent,
28   which applies rule 9(b) . . . to each of the various state consumer protection claims at issue,
     including New York's, despite the Second Circuit's contrary practice").

features, after software updates or otherwise"); *In re iPhone 4S Consumer Litig.*, 2014 WL 589388, at *5-6 (N.D. Cal. 2014), (dismissing consumer fraud claim based on "demonstrations of Siri's functionalities as well as general marketing statements about Siri," because such demonstrations and statements did not include "any specific statement by Apple that expressly indicate[d] that Siri would be able to answer every question, or do so consistently"); *Baltazar v. Apple*, 2011 WL 6747884, at *3 (N.D. Cal. 2011) (dismissing consumer fraud claim, because "[e]ven under the most liberal pleading standard" alleged "brief depictions" of the iPad being used or being taken outdoors "c[ould ]not be construed as a promise that the device w[ould] operate relentlessly outdoors in sunlight").

### B.   Plaintiffs Cannot Allege An Actionable Omission

Plaintiffs also fail to allege an actionable omission. To do so, they must plead with particularity facts showing that Apple both (1) knew of the allegedly omitted information, and (2) had a duty to disclose it. *See*, *e.g.*, *Williamson*, 2012 WL 3835104, at *7 (dismissing omissions claim where "Plaintiff [did] not allege what was actually known to Apple in anything less than a conclusory fashion"); *see also In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016); *Leonard v. Abbott Labs.*, 2012 WL 764199, at *23 (E.D.N.Y. 2012). Plaintiffs plead neither requirement here.

#### 1.   For The Period Prior To June 2017, Plaintiffs Do Not Properly Allege Any Fact That Apple Knew And Failed To Disclose

For the interval from the start of the class period in January 2010 through Project Zero's discovery of Spectre and Meltdown in mid-2017, Plaintiffs fail to allege that *anyone* knew *any* facts related to Spectre and Meltdown, much less that in particular Apple was aware of facts it could have disclosed. Instead, they contend that: (i) "[t]he theoretical possibility of . . . Meltdown" was "identified as early as 1995 in a [published] paper," (Compl. ¶ 4), (ii) Spectre and Meltdown "would have been evident" had Apple "been performing proper tests and security checks," (*id.* ¶ 49), and (iii) "Apple adopted specific changes to iOS and tvOS in 2012 in a[ failed] attempt to secretly defend against Meltdown-based attacks." (*Id.*) But these contentions are non-sequiturs: none describes any specific "fact" about Spectre or Meltdown that Apple even

knew of, much less could have disclosed, other than the contents of an already-published (and thus public) theoretical paper, an unspecified set of "tests" and "checks" it purportedly could or should have performed, and an apparent security threat that Plaintiffs describe only vaguely and without explanation (no doubt intentionally so) as "Meltdown-based."

And in any event, Plaintiffs themselves allege repeatedly -- and accurately -- that Spectre and Meltdown were not "discovered" until 2017. *See, e.g.*, Compl. ¶ 49 (alleging that "three independent teams . . . were able to discover Meltdown" and "two independent teams . . . were able to discover Spectre" in 2017); *id*. ¶ 50 (alleging that the researchers on these teams "discovered" Spectre and Meltdown in 2017).[11] Thus, whatever facts were contained in the 1995 "theoretical" paper, which could or would have been revealed through unspecified "tests" and "checks," or that formed the basis for the undefined "Meltdown-based" attacks that Apple purportedly tried but failed to stop in 2012, they cannot have been the detailed and specific facts Plaintiffs now accuse Apple of having withheld from them. *See, e.g., id.* ¶ 125 (alleging that "Apple failed to disclose . . . that [Apple Devices] suffered from [both Spectre and Meltdown], the nature of [Spectre and Meltdown], that efforts to mitigate [Spectre and Meltdown] would cause impaired performance of [Apple Devices], and that [Spectre and Meltdown] cannot be fully repaired without impairing performance of [Apple Devices]"). In other words, Plaintiffs have not articulated any facts that (even if true) show that anyone *had even discovered Spectre and Meltdown until mid-2017*. To the contrary, they claim the opposite. Given that, Plaintiffs cannot credibly claim that Apple withheld facts about these vulnerabilities before mid-2017.

In short, none of Plaintiffs' allegations come close to meeting the standard of Rule 8(a), much less the heightened one of Rule 9(b), for showing that Apple failed to disclose facts about Spectre and Meltdown prior to mid-2017. *See*, *e.g.*, *Williamson*, 2012 WL 3835104, at *7 (Davila, J.) (finding allegation that "'[a]ccording to sources inside and outside Apple,' the

---

[11] Having repeatedly pled these facts, Plaintiffs are not free to contradict them now, whether in their opposition brief or in an amended complaint. *See VIZIO, Inc. v. Gemtek Tech.*, 2014 WL 12691575, at *3 (C.D. Cal. 2014) (refusing to consider new facts included in opposition because "[s]uch allegations belong in Plaintiff's pleadings"); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990) ("the amended complaint may only allege other facts consistent with the challenged pleading.") (citation omitted).

company began working to correct the defect" insufficient to create inference of knowledge); *Gold*, 2015 WL 7888906, at *2 (highlighting that under Rule 9(b), allegations "must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong'") (internal quotations omitted); *Leonard*, 2012 WL 764199, at *23 (finding that a "plaintiff cannot plead that an omission constituted a deceptive practice based on conclusory allegations of knowledge"); *In re Sling Media*, 202 F. Supp. 3d at 359.[12]

### 2.   For The Entire Class Period, Plaintiffs Can Allege No Actionable Omission

Plaintiffs also fail to allege an actionable omission, because they fail to identify a duty to disclose during any portion of the Class Period. *See* Compl. at *passim*. Specifically: (a) they have not alleged a safety hazard; (b) the "coordinated disclosure" process by which industry participants disclosed Spectre and Meltdown is consistent with government guidelines for the protection of consumers; and (3) Plaintiffs cannot otherwise allege a duty to disclose given Apple's express promise to consumers that it does not identify security vulnerabilities until after mitigations have been designed and released.

### (a)   Apple Had No Duty To Disclose Because Spectre And Meltdown Are Not Safety Hazards

"'California courts have generally rejected a broad obligation to disclose' and have found that 'a manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation *or a safety issue*.'" *Ferranti v. Hewlett-Packard*, 2015 WL 5302674, at *7 (N.D. Cal. 2015) (emphasis added) (Davila, J.) (holding that "for the omission to be material, the failure must still pose safety concerns'") (quoting *Wilson v. Hewlett-Packard*, 668 F.3d 1136, 1142 (9th Cir. 2012)); *Williams v. Yamaha*, 851 F.3d 1015, 1025 (9th Cir. 2017) (endorsing the rule of *Wilson*); *Hodges v. Apple*, 2013 WL 6698762, at *4 (N.D. Cal. 2013). For

---

[12] Not only have Plaintiffs improperly pled such facts, such claims are inconsistent with the hundreds of pages of materials incorporated into their own pleading reflecting the surprise of not only Apple but the entire industry at Project Zero's discovery of Spectre and Meltdown in 2017. *See, e.g.,* Exs. E-F; Ex. G at 5-12; Ex H; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Steckman v. Hart Brewing*, 143 F.3d 1293, 1295 (9th Cir. 1998) (holding that allegations contradicted by matters judicially noticed or incorporated by reference need not be accepted as true).

1   a purported defect to raise safety concerns, plaintiffs must allege that it creates "a risk of physical

2   injury." *Herremans v. BMW*, 2014 WL 5017843, at *14 (C.D. Cal. 2014); *see also Williams*, 851

3   F.3d at 1029 (noting "that the standard is one of an 'unreasonable' safety risk"). Plaintiffs do not

4   allege that the facts they claim Apple should have disclosed raised safety concerns, nor could

5   they. Accordingly, they have failed to allege facts supporting a duty to disclose. *See*, *e.g.*,

6   *Ferranti*, 2015 WL 5302674, at *7 (Davila, J.) (dismissing with prejudice omissions-based fraud

7   claim because "the purported defect d[id] not pose a safety concern to consumers").

8                    **(b)     Apple Had No Duty To Disclose Because Disclosure Would
                              Have Violated Government-Endorsed Guidelines for the
9                              Protection of Consumers**

10          Apple's handling of Spectre and Meltdown – *i.e.*, discussing them publicly only once

11   patches had been released -- was also consistent with guidelines for the "coordinated disclosure"

12   of such vulnerabilities, required by Project Zero for Spectre and Meltdown and endorsed by the

13   Department of Homeland Security ("DHS") for the protection of consumers and the public. *See,*

14   *e.g.*, Ex. D at 2 (explaining that the National Cybersecurity and Communications Integration

15   Center ("NCCIC") at DHS "works with trusted partners . . . in the private sector[] to coordinate

16   timely and responsible disclosures of vulnerabilities [so that r]isks are publicized only after

17   practical and effective mitigations are available to users"); *id*. at 7 (explaining "CERT/CC['s]

18   belie[f that] the Coordinated Disclosure process [provides] the best balance of [] competing

19   interests . . . [because] quickly disclosing [security] information without review and mitigation

20   only opens the public up to exploit"); *id*. at 32, 76 (explaining that "disclosing [vulnerabilities

21   like Spectre and Meltdown] without review and mitigation only opens up the public to

22   exploitation," and warning that even "teasing the existence of a vulnerability" can "increase[]

23   risk to end users"); *id*. at 3 (describing the "Ideal Disclosure Process" as one where "patch[es]"

24   are released before "public security advisories are published"); *see also, e.g.*, Ex. F at 6

25   (explaining that "Apple[, ]like other notified [parties, ]was required to agree not to disclose the

26   vulnerabilities for ninety days"). Apple's decision to comply with these guidelines by joining in

27   Project Zero's "coordinated disclosure" of Spectre and Meltdown -- again, a process expressly

28   intended to protect Plaintiffs and other consumers -- does not give rise an actionable omission.

1   *See*, *e.g.*, Cal. Civ. Code § 1760 (providing that the purpose of the Consumer Legal Remedies

2   Act is "to protect consumers"); *Bildstein v. MasterCard*, 329 F. Supp. 2d 410, 413 (S.D.N.Y.

3   2004) (describing that GBL "Section 349 was designed to protect consumers") (internal

4   quotation marks and citations omitted); *Brace v. Rite Aid*, 2011 WL 635299, at *5 (D.N.H. 2011)

5   (affirming that "[t]he purpose of the [Consumer Protection Act] is to protect consumers").

6               **(c)     Apple Was Under No Duty To Disclose In Light Of Its**
                         **Publicly Stated Policy**

7           Apple was not under a duty to disclose because it expressly told consumers that it does

8   not disclose vulnerabilities until they have been patched. Specifically, Apple tells consumers that

9   "[f]or [their] protection, [it] doesn't disclose, discuss, or confirm security issues until an

10  investigation has occurred and patches or releases are available." Ex. C at 3; *see also id.* at 3-14

11  (describing post-release every security patch Apple has issued). There is nothing misleading

12  about Apple disclosing information about security vulnerabilities in a manner consistent with its

13  publicly-stated policy. *See, e.g.*, *Cohen v. Nassau Educators Fed. Credit Union*, 819 N.Y.S.2d

14  209, *4 (Sup. Ct. 2006), *aff'd*, 832 N.Y.S.2d 50 (2007) (holding that "[f]ully disclosed risks are

15  not deceptive" for purposes of a consumer fraud claim); *Lewis v. Hertz*, 581 N.Y.S.2d 305, 307

16  (1992) (affirming dismissal of consumer fraud claim where "the record show[ed] that the[

17  challenged business] practices [we]re fully disclosed"); *Larin v. Bank of Am.*, 617 F. App'x 651,

18  652 (9th Cir. 2015) (affirming dismissal with prejudice of consumer fraud claim where defendant

19  "disclosed . . . its general policy" and proceeded "in the manner disclosed"); *Augustine v. FIA

20  Card Servs.*, 485 F. Supp. 2d 1172, 1174 (E.D. Cal. 2007) (dismissing consumer fraud claim

21  where defendant "notifie[d] cardmembers of the actions it [could] take in the event of a default").

22  **C.     Plaintiffs Cannot Allege Reliance**

23          "To maintain a [consumer fraud] claim[,] a plaintiff must plead facts showing that she

24  relied on the defendant's alleged misrepresentation." *Hall v. Sea World*, 2015 WL 9659911, at

25  *3 (S.D. Cal. 2015) (internal citation omitted); *Id.* at *5 (holding that "actual reliance" is "[a]n

26  essential element of a fraudulent omission claim"). To prove actual reliance for an omissions-

27  based claim, "a plaintiff must show that had the omitted information been disclosed, one would

28  have been aware of it and behaved differently." *Id.* at *5. In other words, if Plaintiffs cannot

1   "specifically allege that [they] saw or heard, let alone relied on, any advertisements, offers, or

2   other representations of [Apple] in advance of their . . . purchases," Plaintiffs have "fail[ed] to

3   plead how, if the allegedly omitted material had been disclosed, [] Plaintiffs would have been

4   aware of it and behaved differently." *Id*. at *6.[13]

5         "[W]here . . . a plaintiff alleges exposure to a long-term advertising campaign, the

6   plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied

7   on particular advertisements or statements," *Yastrab*, 173 F. Supp. 3d at 980-81 (Davila, J.)

8   (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009)), and in such circumstances, an

9   "inference" of reliance "may" be permitted. *Colman v. Theranos*, 2018 WL 2463097, at *11

10   (N.D. Cal. 2018). Even then, however, Plaintiffs must "comply[] with Rule 9(b)," *Yastrab*, 173

11   F. Supp. 3d at 980, and "'the same level of specificity is required [to plead] reliance' as [is

12   required to plead] misrepresentations." *Marolda v. Symantec*, 672 F. Supp. 2d 992, 1001 (N.D.

13   Cal. 2009); *see also Yastrab* at 980. In other words, for an "inference of . . . reliance" to be

14   justified, Plaintiffs must allege with particularity both the existence of a true long-term

15   advertising campaign and that "class members who were exposed to the campaign [are ]likely to

16   have relied on" it. *Philips v. Ford*, 2016 WL 7428810, at *15-16 (N.D. Cal. 2016), *aff'd*, 726 F.

17   App'x 608 (9th Cir. 2018); *see also, e.g., Hall*, 2015 WL 9659911, at *4 (holding that

18   "statements . . . [not made] as part of a pervasive advertising campaign" cannot support an

19   inference of reliance); *Colman*, 2018 WL 2463097, at *8-9 (following Ninth Circuit holding

20   "that presuming reliance is improper except in extraordinary cases of intense, long-term

21   advertising campaigns where . . . there [i]s little doubt that almost every class member ha[s] been

22   exposed"). Here, Plaintiffs claim to have relied on "extensive and long-term advertising and

23   promotion efforts" by Apple. Compl. ¶ 54. For three independent reasons, their attempt at

24

25   [13] In New Hampshire and New York, this element is labelled "causation" rather than "reliance."
*See Gautschi v. Auto Body Disc. Ctr.*, 660 A.2d 1076, 1078 (1995) (dismissing New Hampshire

26   claim where alleged misrepresentation "did not induce the type of misinformed decision the
[law] addresses"); *In re Chrysler-Dodge-Jeep Ecodiesel*, 295 F. Supp. 3d 927, 1015 n.21 (N.D.
Cal. 2018) (finding that a New York plaintiff "must show . . . a material deceptive act or practice

27   that caused actual . . . harm") (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine
Midland Bank*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 744 (1995)); *In re Myford*

28   *Touch*., 2016 WL 6873453, at *4 (N.D. Cal. 2016) (finding no "meaningful difference in the
requirements of the New York statute and those of other states that require reliance").

pleading reliance in this manner falls short.

*First*, the representations Plaintiffs cite to were not part of any "long-term advertising campaign," let alone one sufficient to justify an inference they relied on it. *See Yastrab*, 173 F. Supp. 3d at 980. Indeed, Plaintiffs cite solely to a handful of YouTube videos and a series of roughly annual press releases published on Apple's website (Compl. ¶¶ 54-80) -- materials that consumers themselves must actively seek out online. Such materials are nothing like the broadly distributed, passively-consumed television commercials and magazine advertisements capable of supporting the inference Plaintiffs seek. *See, e.g.*, *Hall*, 2015 WL 9659911, at *4 (finding that "statements . . . not even made in advertisements, let alone as part of a pervasive advertising campaign" cannot support an inference of reliance); *Colman* 2018 WL 2463097, at *8-9 (finding that "presuming reliance is improper except in extraordinary cases of intense, long-term advertising campaigns"); *Haskins v. Symantec*, 2014 WL 2450996, at *2-3 (N.D. Cal. 2014), *aff'd*, 654 F. App'x 338 (9th Cir. 2016) (finding that "an average consumer would be unlikely to read" or be exposed to "press releases"); *Ono v. Head Racquet Sports*, 2016 WL 6647949, at *11 (C.D. Cal. 2016) (finding it "unreasonable to assume that an individual . . . would have been exposed to" "press releases"). For this reason alone, Plaintiffs' attempt to plead reliance based on "long-term advertising and promotional efforts" fails.[14]

*Second*, Plaintiffs do not allege that any of them ever saw even the press releases and videos they cite. While an inference of reliance "may" be permitted in the context of a "long-term advertising campaign," that does not relieve Plaintiffs of the need to allege actual exposure to the campaign and particular misrepresentations within it that they purportedly relied upon. *Haskins*, 2014 WL 2450996, at *2 (holding that a plaintiff must allege "that she actually saw or heard the defendant's advertising campaign"); *Hall*, 2015 WL 9659911, at *6 (dismissing consumer fraud claims where plaintiffs "d[id] not specifically allege that [they] saw or heard, let alone relied on, any advertisements, offers, or other representations" and thus had "fail[ed] to plead how, if the allegedly omitted material had been disclosed, the[y] would have been aware of

---

[14] This is not to say that Apple does not engage in actual nation-wide advertising. But Plaintiffs have not claimed that they were misled by (or relied on) any such material.

DEF. MOTION TO DISMISS & MEM. ISO THEREOF
Master Docket No. 5:18-CV-00147-EJD

1    it and behaved differently"); *Yastrab*, 173 F. Supp. 3d at 978 (dismissing consumer fraud claim

2    for, among other things, failure to plead reliance, where plaintiff "d[id] not describe what . . . he

3    saw when reviewing 'TV commercials and the Apple website'"). For this reason too, Plaintiffs'

4    attempt to plead reliance based on "long-term advertising and promotional efforts" fails.

5          *Third* and finally, even if the press releases and videos Plaintiffs cite were sufficient and

6    Plaintiffs had viewed them, Plaintiffs do not (and cannot allege) that they would have acted

7    differently had those materials disclosed Spectre and Meltdown. As noted above, Apple told

8    consumers (on the very same website where its press releases are posted) that it "doesn't

9    disclose, discuss, or confirm security issues until an investigation has occurred and patches . . .

10   are available." *See supra* Section VII.B.2(c); Ex. C at 3. In other words, Plaintiffs purchased

11   their Apple Devices knowing that (for their own protection) Apple has a policy of not disclosing

12   security vulnerabilities until after they have been mitigated. Given this, Plaintiffs cannot

13   plausibly allege that had Apple disclosed two specific vulnerabilities -- neither of which has any

14   known exploit or has ever been used to illicitly access information on any Apple Device -- they

15   would have changed their minds. This is particularly true given that, by Plaintiffs' own

16   admission, Spectre and Meltdown affect devices both world- and industry-wide, leaving them

17   with no alternative, vulnerability-free device to turn to (certainly, they allege none). *See Peerless*

18   *Wall & Window Coverings v. Synchronics*, 85 F. Supp. 2d 519, 533-34 (W.D. Pa. 2000), *aff'd*,

19   234 F.3d 1265 (3d Cir. 2000) (finding "no evidence that plaintiff would not have acquired

20   defendant's software . . . had it been disclosed that it was not Y2K-compliant," since there was

21   "no evidence that any Y2K-compliant software . . . was even on the market"). The facts alleged

22   here additionally result in dismissal for the same reasons set forth in *Peerless*.

23         **D.    Plaintiffs Cannot Allege Damages**

24         As explained *supra* Section III, the named Plaintiffs fail to establish standing because

25   they fail to allege that any of them personally suffered an injury from Spectre or Meltdown. In

26   addition, Plaintiffs fail to allege *any injury at all* for purposes of their consumer fraud claims.

27         Since Plaintiffs fail to allege that any device has been illicitly "access[ed]" using Spectre

28   or Meltdown, no consumer at all has suffered damages based solely on the vulnerabilities. *See*

1    *supra* Section IV; *Cahen*, 147 F.Supp.3d at 966, *aff'd  Cahen*, 717 F. App'x at 723 (finding that

2    "future injury caused by insecure software is not an injury"); *Yunker*, 2013 WL 1282980, at *5.

3    And since Spectre and Meltdown affect devices similarly world- and industry-wide, Plaintiffs

4    cannot plausibly allege that any consumer would (or even could) have switched to another

5    company's device or bargained Apple down, or that the market would (or could) have done that

6    work for them. *See supra* Section VII.C; *Cahen* at 970, *aff'd Cahen*, 717 F. App'x at 723 (voicing

7    skepticism that a defect that affects an entire industry "would translate into economic injury").

8         Further, however, Plaintiffs cannot point to any basis for an expectation -- by either

9    themselves or any other consumer -- of what the actual performance of any Apple Device should

10   be. Indeed, they allege no promise at all by Apple that Apple Devices will perform to any

11   specific speed or other metric (much less what the basis for that promise would have been). *See,*

12   *e.g.*, *Tae Hee Lee v. Toyota Motor Sales*, 992 F. Supp. 2d 962, 972 (C.D. Cal. 2014) (finding no

13   damages where plaintiffs had not alleged "representations about the amount or extent of speed

14   reduction provided by" defendant's product); *Hyundai*, 2014 WL 12579305, at *7 (C.D. Cal.

15   2014) (finding no damages where plaintiffs' claims were based on the frequency and speed with

16   which airbags deployed, but they "ha[d] not alleged . . . any representations related to [such]

17   frequency or speed"). A small, variable reduction off of an unspecified (and non-universal)

18   benchmark is simply not -- absent far more specific allegations of impact than Plaintiffs have

19   provided here -- a cognizable consumer fraud injury. *See id.*

20   **VIII.   PLAINTIFFS CANNOT STATE AN UNFAIR COMPETITION CLAIM**

21        California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or

22   fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal.

23   Bus. & Prof Code § 17200.[15] Plaintiffs allege that Apple violated the UCL by engaging in unfair,

24   fraudulent, and unlawful actions. Compl. ¶¶ 131-138. Their claims fail under all three theories.

25        As a threshold matter, Plaintiffs' UCL claim fails under all three prongs for two reasons.

26   First, for the reasons explained above in Section VII.C, they have failed to allege reliance. *See,*

27

28   [15] Plaintiffs' unfair competition claim is limited to California's UCL. Plaintiffs do not assert any
     such claim under New Hampshire or New York law.

1   *e.g.*, *In re Tobacco II Cases*, 46 Cal. 4th at 306; *see also Moore v. Apple*, 73 F. Supp. 3d 1191,

2   1200 (N.D. Cal. 2014). And second, their allegations provide no basis for restitution or an

3   injunction, which are the only remedies available under the UCL. *See Hall*, 2015 WL 9659911,

4   at *2 (explaining that "[u]nder the UCL . . . a plaintiff may only recover restitution and

5   injunctive relief"); *Wofford v. Apple*, 2011 WL 5445054, at *3 (S.D. Cal. 2011), citing *Kwikset.*

6   *v. Superior Court*, 51 Cal. 4th 310, 336 (2011)). This is because "the loss of use and loss of value

7   of Plaintiffs' iPhones [and other Apple Devices] are not recoverable as restitution because they

8   provide no corresponding gain to [Apple]," and "[i]njunctive relief is inappropriate as well

9   because [Apple] remedied the software defect . . . [by] releas[ing] a patch through iOS[11]."

10  *Wofford*, 2011 WL 5445054, at *3.

11         But Plaintiffs' UCL claim also fails for reasons specific to each of its three prongs. It fails

12  under the "fraudulent" prong, because for the reasons discussed *supra* Section VII.A-B, Plaintiffs

13  have alleged neither an affirmative misstatement or an actionable omission. *See*, *e.g.*, *Baltazar v.*

14  *Apple*, 2011 WL 3795013, at *6 (N.D. Cal. 2011); *Yastrab*, 173 F.Supp.3d at 981 (Davila, J.). It

15  fails under the "unlawful" prong because Plaintiffs have failed to allege any independent

16  violation of the law, including under the CLRA. *See*, *e.g.*, *Williamson*, 2012 WL 3835104, at *9.

17  And it fails under the "unfair" prong, because Plaintiffs do not (and cannot) allege that Apple

18  engaged in conduct that "'offend[s] an established public policy or [is] immoral, unethical,

19  oppressive, unscrupulous, or substantially injurious to consumers,' or [is] 'tethered' to specific

20  constitutional, statutory or regulatory provisions.'" *McKinney*, 2011 WL 3862120, at *7; *see also*

21  *Williamson*, 2012 WL 3835104, at *9.

22  **IX.    PLAINTIFFS' TACK-ON CLAIMS ALSO FAIL**

23         Plaintiffs' claims for unjust enrichment, negligence, and strict liability also fail. As a

24  threshold matter, Plaintiffs fail to identify the law they say applies -- a failure that on its own is

25  grounds for dismissal. *See Glenn v. Hyundai*, 2016 WL 3621280, at *13 (C.D. Cal. 2016). Even

26  assuming that California law governs however, Plaintiffs can state none of these claims.

27         **A.     Plaintiffs Cannot State An Unjust Enrichment Claim**

28         Plaintiffs' unjust enrichment claim fails (1) because unjust enrichment is not a cause of

action in California, (2) because the conduct on which Plaintiffs' claim is based is covered by -- as well as disclaimed under -- their express, valid contracts with Apple, in the form of the Hardware Warranty and the Software License and (3) because Plaintiffs are not entitled to restitution, which is the only remedy available for unjust enrichment. *See Missaghi v. Apple*, 2013 WL 12203021, at *5 (C.D. Cal. 2013) (holding that "unjust enrichment is not a cause of action" in California and dismissing unjust enrichment claim because Apple products are governed by Apple's warranties) (internal quotations omitted); *Marcus*, 2015 WL 151489, at *10 (same); *Berenblat v. Apple*, 2009 WL 2591366, at *6 (N.D. Cal. 2009) (explaining that unjust enrichment "does not describe a theory of recovery, but an effect: the result of a failure to make restitution," and dismissing claim because "unjust enrichment cannot stand alone without a cognizable claim under a quasi-contractual theory or some other form of misconduct"); disc. *supra* at Section VIII (explaining why Plaintiffs are not entitled to restitution here). For all of these reasons, Plaintiffs' unjust enrichment claim should also be dismissed.

### B.   Plaintiffs Cannot State A Products Liability Claim

Finally, Plaintiffs' strict liability and negligence claims fail under the economic loss rule, which does not permit a plaintiff to recover purely economic damages -- *i.e.*, damages that do not involve physical injury or property damage -- in tort for a product defect when the defect causes no physical injury or damage to other property. *See*, *e.g.*, *McKinney*, 2011 WL 3862120, at *8 (Davila, J.) (dismissing negligence claim because "[e]conomic loss alone, without physical injury, does not amount to the type of damage that will cause a negligence or strict liability cause of action to accrue"); *see also Suffolk Laundry Servs. v. Redux*, 238 A.D.2d 577, 578 (1997) (same); *Lockheed Martin v. RFI Supply*, 440 F.3d 549, 554 (1st Cir. 2006) (same). Because Plaintiffs fail to allege an injury to any person or to any property apart from the Apple Devices themselves, their products liability claims must be dismissed.

## X.   CONCLUSION

For the foregoing reasons, Apple respectfully requests that Plaintiffs' Complaint be dismissed in its entirety and with prejudice.

1  Dated: August 7, 2018                    Respectfully submitted,

2                                           LATHAM & WATKINS LLP

3                                           By: /s/ *Matthew Rawlinson*

4                                               Matthew Rawlinson

5                                           *Attorneys for Defendant Apple Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28