UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE APPLE PROCESSOR LITIGATION

Case No. 5:18-cv-00147-EJD

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Re: Dkt. No. 75

Putative class action Plaintiffs ("Plaintiffs") are purchasers or lessors of certain Apple products ("iDevices") that each contain a central processing unit ("CPU"), which Plaintiffs allege suffers from a design defect that allows unauthorized third-parties to access sensitive user data. Plaintiffs bring this lawsuit against Defendant Apple ("Apple") alleging that they paid more for their iDevices than they were worth because Apple knowingly omitted the defect; the value of Plaintiffs' products has diminished; and Apple's attempts to mitigate the defects with patches through software updates materially slowed down the performance of their iDevices.

Apple has filed a motion to dismiss Plaintiffs' second consolidated amended complaint ("SCAC") with prejudice stating that (1) under Federal Rule of Civil Procedure 12(b)(1) Plaintiffs still lack Article III standing as they have not remedied their standing deficiencies in their most recent amended complaint and (2) under Federal Rule of Civil Procedure 12(b)(6) for inadequate pleading of their misrepresentation, omission, reliance, and damages claims.

This court has subject matter jurisdiction based upon the Class Action Fairness Act. 28 U.S.C. § 1332(d). After considering the papers submitted and hearing oral argument on the

motion, the court finds that Plaintiffs lacks Article III standing. Because of this, and the previous opportunities to cure this defect, Defendant's motion to dismiss is granted without leave to amend.

## I. BACKGROUND[1]

### A. The Parties

Plaintiffs are Jennifer Abrams (CA), Anthony Bartling (NH), Robert Giraldi (NY), and Jacqueline Olson (NY) ("Plaintiffs") who, on behalf of themselves and all others similarly situated, allege upon personal knowledge as to their own acts and upon information and belief as to the remaining matters, that certain Apple products such as iPhones, iPads, and the Apple TV (collectively "iDevices") all contain a central processing unit that is defective. SCAC ¶ 1.[2] Plaintiffs allege that they have been harmed by Apple's attempts to mitigate the alleged design defect through software updates 11.2 and 11.2.2 have severely degraded the processor performance in their iDevices and renders their iDevices less valuable.

Plaintiffs bring their class action pursuant to Federal Rule of Civil Procedure 23 and seek to represent a class that consists of:

> All persons in the United States who purchased or leased from Apple and/or its authorized retailer sellers one or more iPhones, iPads, Apple TVs, or other products containing processors designed or modified by Apple, at any time since January 1, 2010.

*Id.* ¶ 115. Plaintiffs also seek to represent three subclasses: The "California Subclass," the "New Hampshire Subclass," and the "New York Subclass." *Id.* ¶ 117. These classes are comprised of members who purchased such iDevices within their respected states. *Id.*

Defendant Apple ("Apple") is a business incorporated in Delaware with a principal place of business in Sunnyvale, California. Apple designs, manufactures, distributes, and sells products such as laptops, desktop computers, iDevices, and other computing devices that contain processors. *Id.* ¶ 18.

---

[1] The background is a summary of the allegations in the SCAC.
[2] Plaintiffs do not assert a claim for a product defect in this action.

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
2

**B. The Alleged Defect**

Within each of Plaintiffs' iDevices resides +a central processing unit, also known as a processor or computer "chip." *Id.* ¶ 24. This processor is based on architecture licensed from an engineering firm ARM Holdings. *Id.* ¶ 43. Apple then modifies the processor by designing their own "microarchitecture." Many companies use ARM's designs in their products differently; however, how Apple modifies its processors is unique to Apple. *Id.* ¶¶ 45, 48. For example, Apple customizes its processors with two optimization techniques called "speculative execution" and "out-of-order execution," which enable faster processor performance by either allowing programs to run simultaneously or prior to a program being requested to run. *Id.* ¶ 30. Since as early as 2010, when Apple began customizing its processors, Apple's processors have been used exclusively in Apple products. *Id.* ¶ 48. The processor within the iDevice works with Apple's operating system ("OS") to carry out the computer's programs and instructions. *Id.* ¶¶ 24, 25. In 2017, independent security researchers discovered that these processors contain two vulnerabilities that allow unauthorized third parties to access sensitive user data. *Id.* ¶ 2. The two vulnerabilities are called "Meltdown" and "Spectre."[3] *Id.* Plaintiffs allege that the way in which Apple's optimization techniques are employed allow bad actors to access exposed sensitive data that would normally need to process through security checks or require isolation within the OS. *Id.* ¶¶ 30–42.

Apple is aware of the vulnerabilities and made a public announcement on January 4, 2018, stating that on December 2, 2017, Apple released iOS 11.2, a software update to address Meltdown. *Id.* ¶ 54. On January 8, 2018, Apple released iOS 11.2.2, a software update to address Spectre. *Id.* Plaintiffs allege that Apple knew of the vulnerabilities and did not publicly disclose them until after the New York Times posted an article leaking the information. *Id.* ¶ 84. Once leaked, Apple responded ahead of a "coordinated disclosure" date agreed upon by Apple, Intel, Google, Microsoft, Amazon, AMD, and ARM. *Id.* Plaintiffs assert that these vulnerabilities are

---

[3] The security issues raised by Meltdown and Spectre apply to all modern processors and affect nearly all computing devices and operating systems. Researchers have identified multiple variants of Meltdown and Spectre. SCAC ¶ 49. How each manufacturer, such as Apple, Intel, or AMD, decides to mitigate the vulnerabilities varies depending on how they modify their chips. *Id.* ¶ 50.

United States District Court
Northern District of California

material because "had they known data stored on their systems would be compromised and made available to unauthorized third parties" they would not have purchased their iDevices. *Id*. ¶ 68. Plaintiffs also allege that after Apple made these announcements, iDevices declined in value. *Id*. ¶¶ 71–79.

### C. Procedural History

On June 8, 2018, Plaintiffs filed consolidated amended complaint against Apple alleging 16 causes of action. Dkt. No. 46. On August 7, 2018, Apple filed a motion to dismiss, which the court later granted with leave to amend. Dkt. Nos. 49, 66. In granting Apple's motion to dismiss, the court determined that Plaintiffs had not established standing and therefore the court did not address the substance of the claims. Dkt. No. 66 ("Order"). Plaintiffs could neither show that a named plaintiff had personally suffered from slower performance, nor a universal injury. Order at 5–8. At that time, Plaintiffs had not even alleged they personally downloaded the patches they alleged caused the degrading performance. Additionally, Plaintiffs did not sufficiently allege that their personal iDevices suffered any actual diminution in value. *Id*. at 8. Plaintiffs have since amended their complaint by adding facts in support of their standing arguments while also narrowing their claims down to seven. Plaintiffs seek an order enjoining Apple from continuing and maintaining its alleged violations. For the class, Plaintiffs seek certification, and damages—including actual, statutory, punitive, and/or civil penalties. They also request costs and attorney's fees. Apple moves to dismiss Plaintiffs' SCAC for lack of sufficient facts in support of standing or any cause of action. Dkt. No. 75.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). Although particular detail is not generally necessary, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." *Id*.

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

4

at 555, 570. A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (internal citation omitted); *see Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090, 1096 (9th Cir. 2016).

At the motion to dismiss stage, the court must read and construe the complaint in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). Additionally, the court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Nor is a complaint sufficient if it merely "tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "In all cases, evaluating a complaint's plausibility is a 'context-specific' endeavor that requires courts to draw on . . . judicial experience and common sense." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Claims that sound in fraud are subject to a heightened pleading standard. Fed. R. Civ. Proc. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003) (recognizing that claims "grounded in fraud" or which "sound in fraud" must meet the Rule 9(b) pleading standard, even if fraud is not an element of the claim). The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). This requires an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). In

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

5

other words, fraud or claims asserting fraudulent conduct must generally contain more specific facts than is necessary to support other causes of action.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).[4] *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (holding the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.").

In the event that a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

## III.   DISCUSSION

Apple moves to dismiss all of Plaintiffs' claims alleged in their SCAC on Article III standing grounds, arguing Plaintiffs have not remedied their FCAC and still lack a showing that any named Plaintiff has suffered an injury-in-fact. Apple also moves to dismiss each of Plaintiffs' substantive claims for failure to state a claim upon which relief can be granted. Because Article III standing is a threshold jurisdictional question, the court will address Apple's 12(b)(1) motion prior to analyzing the substance of the claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *United States v. Larson*, 302 F.3d 1016, 1019 (9th Cir. 2002).

---

[4] Pursuant to Federal Rule of Evidence 201, the court may take judicial notice of matters of public record but may not take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b). The court declines to take judicial notice of Apple's Exhibits A through I because they were not needed to arrive to the conclusion regarding standing. *See* Dkt. No. 76.

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

6

**A. Article III Standing**

Standing is properly challenged through a Rule 12(b)(1) motion. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "A plaintiff has the burden to establish that it has standing." *WildEarth Guardians v. United States Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). Article III of the Constitution extends the judicial "Power of the United States" to only "Cases" and "Controversies." Art. III, § 2; *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To satisfy Article III standing, a plaintiff must establish: (1) an "injury in fact" that is both concrete and particularized, as well as actual and imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, rather than merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). Particularity and concreteness are two separate inquires. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1111 (2017). An injury is concrete when it actually exists. *Spokeo*, 136 S. Ct. at 1548. Intangible injuries can be concrete. *Id.* at 1549. For an injury to be "particularized," as required for Article III standing, it "must affect the plaintiff in a personal and individual way." *Id.* at 1548.

"In class actions, the named representatives must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (quoting *Pence v. Andrus*, 586 F.2d 733, 736–37 (9th Cir. 1978)); *see also Spokeo*, 136 S. Ct. at 1547 (adding that injury suffered by other unidentified members of the class to which named plaintiffs belong is not enough to meet Article III standing). The Supreme Court has further emphasized that "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1142–43 (2013) (internal quotations and citations omitted).

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

7

Here, Plaintiffs allege injury exists by way of the degraded performance of their iDevices and a diminution in value. The first, Plaintiffs allege, is the result of Apple's attempts to mitigate the vulnerabilities of Meltdown and Spectre on their processors by applying two "patches" also known as software updates, which has caused iDevices to perform slower than advertised. The diminution in value, Plaintiffs argue through a new regression analysis, also provides an economic injury-in-fact. The court will address each of the alleged injuries in turn, beginning with iDevice performance degradation.

### 1. Injury-In-Fact Based on Performance Degradation

Apple contends Plaintiffs still lack standing because "they still have not alleged any personal injury or any facts that can support an inference that they personally were harmed by a purported performance degradation caused by Apple's software updates." Dkt. No. 75 at 16–17. Additionally, Apple argues, even with Plaintiffs' newly added facts of testing an iPhone 7, universal injury does not exist. *Id*. at 17. The court agrees that Plaintiffs have failed to cure their pleadings to show that a named class plaintiff has experienced a degraded performance on their personal iDevice. Plaintiffs are able to show the possible existence of a concrete injury, but lack a showing of particularization.

#### a. Whether Plaintiffs' injury is concrete

Concreteness requires that an injury be "de facto," meaning that it must actually exist. *Spokeo*, 136 S. Ct. 1540, 1548. Here, Plaintiffs add facts in their SCAC that they tested an iPhone 7, which measured the "real-world performance impact of Apple's mitigation efforts by recording the time it took these iDevices to perform common operations." SCAC ¶ 61. Plaintiffs assert that "[i]n each instance, the iPhone with the Meltdown and Spectre mitigations installed performed significantly worse than those with iOS versions that did not include Apple's mitigation efforts." *Id*. Downloading applications such as Facebook Messenger, Instagram, and Google Maps, on average, were processed 40.6 percent slower after installing "a version of iOS containing Apple's mitigation efforts than it did before." *Id*. ¶ 62. A test that involved the downloading of a 4k video clip after the software update, performed at a rate 7.6 percent slower than it did before the update.

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

8

*Id.* ¶ 63. Plaintiffs allege that these results are consistent with testing done by iPhone consumers (*Id*. ¶ 64) and statements made this year by an organization within the Department of Homeland Security, the U.S. Computer Emergency Readiness Team ("CERT") (*Id*. ¶ 65). In taking Plaintiffs' statements as true, the testing supports a showing that some iDevices, such as an iPhone 7, may experience degradation in performance after the user downloads Apple's patches through the software updates. Plaintiffs' allegations of performance degradation in some iPhones does exist and thus is enough to establish a concrete injury at this stage. Next, the court looks to whether the concrete injury is particularized. *Spokeo*, 136 S. Ct. at 1548.

### b. Whether Plaintiffs' injury is particularized

A particularized injury affects "the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. What is fatal to Plaintiffs' SCAC is that no facts support a showing that any named plaintiff noticed any slowdown or performance degradation after downloading Apple's updates. SCAC ¶¶ 11, 13, 15, 17. Plaintiffs' argument is based on a universal injury theory, as alleged in their earlier complaint. Previously, the court analyzed Plaintiffs' alleged facts, which included industry-type testing such as the "GeekBench 4 benchmark test" against two cases: *Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025 (N.D. Cal. 2016), and *John v. Whole Foods Mkt. Group., Inc.*, 858 F.3d 732 (2nd Cir. 2017) and found that cited testing reports supported an inference that some but not all users experienced slower performance in their iDevices. Order at 8. In sum, the testing provided by Plaintiffs with regards to a degradation in performance of some iDevices after the software updates were installed, did not meet the standards for a universal-type injury as found in cases like *Strumlauf* and *Whole Foods*.

Plaintiffs return and add new testing facts to their SCAC to double down on their universal injury argument. Plaintiffs now move away from their previous arguments regarding benchmark testing by stating that some of the benchmark tests "do not accurately represent real world conditions and consequently do not reflect the decrease in performance an actual iDevice user experiences after upgrading to those iOS versions." SCAC ¶ 58. Plaintiffs now put forward an example of testing real world conditions with an iPhone 7. Plaintiffs state that "*an* iPhone 7—the

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
9

same [model] phone owned by Plaintiffs Giraldi and Olson" was tested to measure the "real world" performance impact of Apple's mitigation efforts. *Id*. at ¶ 61 (emphasis added). Plaintiffs allege that in each instance, this iPhone with the mitigated software updates performed "significantly worse" than those without the updates. *Id*.

Plaintiffs ask the court to infer that because the tested iPhone 7 experienced slower performance, and because all the iDevices in the class also contain the processor within the iPhone 7, that all iDevices (iPhones, Apple TVs, iPads) must suffer from the same degraded performance. Dkt. No. 78 at 16. Plaintiffs allege that their iDevices are running the same iOS versions as the tested iPhone 7 and therefore they must also be "suffering from the same reduction in performance." *Id*. at 15. Even with the new test of one iPhone 7, and even taking Plaintiffs' statement about the one iPhone's slower performance as true, their universal injury argument is still unpersuasive. Conducting tests to a single recently purchased iPhone 7 is insufficient to infer universal injury to all iPhone 7 users and certainly not enough to support a showing of injury across all the iDevices the class seeks to represent. Plaintiffs are still without personal injury. *See Goodman v. HTC America, Inc*., No. C11-1793MJP, 2012 WL 2412070 (W.D. Wash. June 26, 2012) (stating that a plaintiff "must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants") (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). In sum, Plaintiffs have failed to plead facts that any named plaintiff experienced the performance degradation that the single tested iPhone 7 experienced and thus do not plead an injury that is particularized.

In conclusion, Plaintiffs have not met the burden in establishing injury-in-fact based on their performance degradation argument. Plaintiffs' second assertion of injury is based on an economic loss theory that their phones have lost value and that they paid too much for them because Apple omitted the vulnerabilities from the public.

### 2. Injury-In-Fact Based on a Diminution in Value

#### a. Whether Plaintiffs' injury is concrete

Apple moves to dismiss Plaintiffs' diminution in value theory because Plaintiffs' new facts

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
10

still do not demonstrate injury-in-fact. Dkt. No. 75 at 19–21. In the Ninth Circuit, "[w]hen economic loss is predicated solely on how a product functions, and the product has not malfunctioned, the Court agrees that something more is required than simply alleging an overpayment for a 'defective' product." *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 970 (N.D. Cal. 2015), *aff'd*, 717 Fed. App'x 720 (9th Cir. 2017) (unpublished) (finding class plaintiffs' economic loss theory insufficient to establish standing because plaintiffs alleged no facts to show their cars were worth less). Plaintiffs can allege something more by showing a demonstrable effect on the market for their specific product. *See id*.

Previously, the court found that Plaintiffs' statement that they "would not have purchased [their] iDevices, or paid the prices they did" was not enough to establish standing under a diminution in value argument. Order at 9. Plaintiffs return alleging something more by way of a regression analysis they applied to measure the loss of value of an iPhone. Plaintiffs allege that their regression analysis showed that the prices of Plaintiffs' iPhones decreased "on average" by more than seventy-nine dollars following Apple's announcement about Meltdown and Spectre vulnerabilities. SCAC ¶ 78. Plaintiffs are silent regarding the other iDevices in the class such as iPads and/or AppleTVs. The issue is whether Plaintiffs' proffered regression analysis is enough to show a demonstrable effect on the market, and thus a concrete injury at this stage.

An example of a demonstrable effect on the market can be seen in *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1166 (C.D. Cal 2011). There, the economic harm theory from plaintiffs' argument that their vehicles were worth less and that they overpaid for them because they contained a safety defect argument could be accurately measured. The plaintiffs were able to establish that although they did not experience the safety defect themselves, once the recalls from Toyota had been made public, one plaintiff's 2007 Toyota Sienna trade-in value dropped by $2,000 according to Kelly Blue book, an established reliable resource for automobile valuation. *Id*. at 1166. Similarly, "[a] current reduction in the economic value of one's home is a cognizable injury for constitutional standing purposes." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070–71 (9th Cir. 2011) (finding plaintiffs sufficiently alleged that defendants had inflated the bubble in their

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
11

1    particular neighborhood, which caused them to overpay).  Measuring the value of an electronic

2    product with an unmanifested alleged defect is less clear.

3          The regression analysis conducted by Plaintiffs seeks to show a demonstrable effect on the

4    market.  The analysis covered actual transactions among consumers in the smartphone market.

5    SCAC ¶ 77.  This included data from more than 75,000 transactions from iDevices and

6    comparable smartphones between September 1, 2017 and August 31, 2018.  *Id*.  The iDevices

7    included the iPhone 6s Plus, iPhone 7, iPhone 8 Plus, and iPhone SE, which are the same models

8    of iDevices that Plaintiffs own, along with comparable phones manufactured around the same time

9    by Apple's competitors, such as, the Samsung Galaxy S6, Galaxy S7, and Galaxy S8 Plus, and

10   Google Pixel.  *Id*.  Plaintiffs allege they controlled for things such as like age, condition, and

11   storage size in addition to broader economic factors such as "changes in inflation, the United

12   States' gross domestic product, unemployment rates, non-farm payroll numbers, and overall

13   industrial production."  *Id*. ¶ 78.

14         Through this analysis, Plaintiffs allege, an average sale price for an iPhone 7 with 256 GB

15   of storage, dropped more than 11.5 percent from the week prior to the news of Meltdown and

16   Spectre to the week after.  *Id*. at ¶ 73.  Over a similar span of time, Plaintiffs allege, an iPhone SE

17   dropped more than 16 percent, an iPhone 6s Plus dropped more than 18 percent, and an iPhone 8

18   with 64 GB of storage dropped more than 13.5 percent.  *Id*. ¶¶ 74–76.  Plaintiffs allege that the

19   impact on Samsung and Google phones from Apple's January 2018 announcement was less than

20   half of that observed for the iPhones.  *Id*. ¶ 79.  The result, Plaintiffs assert, is that because of

21   Meltdown and Spectre, iPhones have declined in pricing.  *Id*. at ¶ 79.

22         There does not appear to be an industry standard on measuring the value of electronics

23   such as the iDevices in this case.  Plaintiffs attempt to measure the value through its regression

24   analysis, but it is not enough to establish a demonstrable, reliable indicator of market effect as is

25   the case when measuring the housing market or vehicles through Kelly Blue Book.  The

26   measurement for the value of electronics in these circumstances must be more well-known or

27   widespread.

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
12

Even taking Plaintiffs' statements as true, Plaintiffs' underlying argument is still weak. Plaintiffs conducted this analysis surrounding Apple's announcements about Meltdown and Spectre—not the degraded performance—that are unmanifested vulnerabilities. As it was then, it stands still today, that no named Plaintiff, nor any consumer of any iDevice or computer related product—from Apple or otherwise—has seen these potential vulnerabilities exploited. Computer manufacturers such as Apple, among others, do not advertise that their computers will be free from defect. Moreover, Judges in this circuit refuse to find standing where plaintiffs allege a future risk of harm unless harm is certainly impending. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013); *Birdsong v. Apple*, 590 F.3d 955, 970 (9th Cir. 2009); *In re Zappos.com, Inc*., 108 F. Supp. 3d 949 (D. Nev. 2015); *Cahen v. Toyota Motor Corp*., 147 F. Supp. 3d 955, 970 (N.D. Cal. 2015), *aff'd*, 717 Fed. App'x 720 (9th Cir. 2017) (unpublished); *Boysen v. Walgreen Co*., No. 11-cv-06262-SI, 2012 U.S. Dist. LEXIS 100528, 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012); *Contreras v. Toyota Motor Sales USA, Inc*., No. 09-cv-06024-JSW, 2010 U.S. Dist. LEXIS 60479, 2010 WL 2528844, at *1 (N.D. Cal. June 18, 2010). Thus, it is more likely Plaintiffs' regression analysis results are affected by other factors and not necessarily the announcement of an unmanifested risk of harm that applies to all modern processors.

Plaintiffs' reliance on *In re: Lenovo Adware Litigation* in attempt to measure the economic value is also unpersuasive for one simple distinctive reason: unlike the circumstances in Plaintiffs case, there was no hypothetical risk, the plaintiffs in *Lenovo* actually experienced a security breach in their laptops. No. 15-md-02624-RMW, 2016 WL 6277245, at *5 (N.D. Cal. Oct. 27, 2016). In *Lenovo*, the court found that a security vulnerability actually exploited "decreased the value" of plaintiffs' laptops. This actual injury was enough to show they overpaid and establish standing at the pleading stage. *Id*. at *4. Plaintiffs' circumstances are distinguishable because no third-party has actually accessed their iDevices or user's personal data by way of Meltdown or Spectre.

Apple also argues that Plaintiffs cannot, as a matter of law, suffer an injury-in-fact based on a diminution in value theory where they cannot identify an alternative product that they would have purchased. Dkt. No. 75 at 21, citing Boysen, 2012 WL 2953069 at *7 n.9. In *Boysen*,

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
13

plaintiffs alleged that Walgreens failed to disclose the presence of "material and significant" levels of arsenic and lead in its "100% Apple Juice" and that the omission of these toxins were false and misleading. *Id*. at *1. Plaintiffs stated that "had they known the products contained lead and arsenic" they would not have purchased the products. *Id*. The court held that plaintiff lacked standing because he did not allege that the products caused him any physical injury, that any other person had been injured, or that he would have purchased an alternate juice. *Id*. at *7. More specifically, the court noted that "most if not all consumer fruit juices contain levels of lead and arsenic" and that it was unclear whether an alternative juice existed. *Id*. at *7 n.9.

*Boysen* is similar to Plaintiffs' circumstances in that Plaintiffs allege that had they known about the Meltdown and Spectre vulnerabilities, they would not have made their purchases. SCAC ¶¶ 84, 85. Apple advertises the "benefits, capabilities, and quality of its Processors and iDevices," and specifically the speed of its Processors and the security of its iDevices. *Id*. ¶ 86. Even still, Plaintiffs do not allege that they personally have been harmed by the Meltdown or Spectre vulnerabilities or that anyone has been harmed by these vulnerabilities. Apple made attempts to mitigate harm by applying patches to certain iOS systems and as a result, some iPhones have experienced slowdowns, but, like in *Boysen*, none of the Plaintiffs have personally experienced these slowdowns nor have any Plaintiffs suffered any injury from the vulnerabilities Apple sought to protect its consumers from. There is nothing to show that the iDevices are not "fast" or not "safe" as advertised. Lastly, it appears undisputed that Spectre and Meltdown affect all modern processors and affect nearly all computing devices and operating systems. Thus, although Plaintiffs do add facts that Apple's "speculative execution" and "out-of-order execution" optimization techniques are unique to Apple and create a situation in which iDevices may be more vulnerable than devices that do not use these techniques, it is unclear whether there are any phones or similar devices that are not subject to the same vulnerabilities. Thus, it is unclear whether there are smartphones that are not affected by Meltdown or Spectre.

In sum, Plaintiffs have not established standing. Accordingly, the court need not address the substantive claims.

Case No.: 5:18-cv-00147-EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
14

## IV. CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motion to dismiss is GRANTED without leave to amend.

**IT IS SO ORDERED.**

Dated: August 2, 2019

EDWARD J. DAVILA
United States District Judge